USCA1 Opinion

 

 UNITED STATES COURT OF APPEALS FOR THE FIRST CIRCUIT ____________________ No. 93-1391 UNITED STATES, Appellee, v. GEORGE CALVIN BEASLEY, Defendant, Appellant. ____________________ APPEAL FROM THE UNITED STATES DISTRICT COURT FOR THE DISTRICT OF MASSACHUSETTS [Hon. William G. Young, U.S. District Judge] ___________________ ____________________ Before Breyer, Chief Judge, ___________ Boudin and Stahl, Circuit Judges. ______________ ____________________ Jeffrey A. Lipow with whom Lipow, Barton & Harris was on brief _________________ _______________________ for appellant. Jeffrey A. Locke, Assistant United States Attorney, with whom A. ________________ __ John Pappalardo, United States Attorney, was on brief for appellee. _______________ ____________________ December 21, 1993 ____________________ BREYER, Chief Judge. George Beasley appeals his ____________ conviction for possessing heroin with intent to distribute it, 21 U.S.C. 841(a)(1), and his related twenty-two year prison sentence. His most important argument focuses upon the lawfulness of the Sentencing Guidelines' "career offender" provision, which increases the guideline prison term for offenders with two previous "controlled substance" convictions. U.S.S.G. 4B1.1. In his view, the relevant authorizing sentencing statute, 28 U.S.C. 994(h), permits the "career offender" guideline to take account of previous federal drug convictions, but not of convictions under state _______ drug laws. Like the two other circuits that have considered this argument, we reject it. United States v. Rivera, 996 _____________ ______ F.2d 993 (9th Cir. 1993); United States v. Whyte, 892 F.2d _____________ _____ 1170 (3d Cir. 1989), cert. denied, 494 U.S. 1070 (1990); see ____________ ___ also United States v. Dyer, No. 93-1045 (1st Cir. June 18, ____ _____________ ____ 1993) (per curiam). And, because we find Beasley's other ___ ______ arguments unconvincing, we affirm the district court's judgment. I Background __________ On January 25, 1991, a customs inspector at Newark Airport noticed what turned out to be heroin leaking from a -2- 2 puncture hole in a suitcase. She stopped the apparent owner of the suitcase, Habib Makdessi, who, eventually, agreed to help agents apprehend others involved in an elaborate plot to smuggle heroin from Beirut to, and through, Boston. Agents flew with Makdessi and the suitcase to Boston and checked into a hotel, where, Makdessi had told the agents, he would receive further instructions. After about one week, during which Makdessi had various phone conversations related to delivery of the suitcase, Makdessi received an authoritative call, which agents monitored, telling him that he should give the heroin-filled suitcase to a person who would come to Makdessi's room, identify himself as "Paul," say that "Ahmed sent me," and give Makdessi $20,000. During that conversation, Beasley knocked on the door, entered the apartment, told Makdessi that "Ahman sent me," identified himself as "Paul," and gave Makdessi $20,000. Makdessi gave Beasley the suitcase, and he told Beasley that it contained "a lot" of heroin. Makdessi added that the suitcase had been punctured and was leaking heroin. He gave Beasley a shower cap filled with some of the heroin that had spilled. Beasley lifted the suitcase and shook it. Government agents, who had monitored the drug delivery with hidden -3- 3 cameras and audio recorders, arrested Beasley as he left with the suitcase. After Beasley's conviction, the sentencing court turned to the Guidelines. It found that Beasley possessed (with intent to distribute) just over three kilograms of heroin, that Beasley had one previous conviction for violating a federal drug law (for possessing, with intent to distribute, about 25 grams of heroin), and that Beasley had one previous conviction for violating a state drug law (for selling about one-half gram of heroin). Ordinarily, the amount of the drug and two prior felony convictions would produce a Guideline sentencing range of 188 to 235 months imprisonment (Offense Level 34, Criminal History Category III). U.S.S.G. 2D1.1(c)(5), 4A1.1. But, because Beasley's "two prior felony convictions" were for "a controlled substance offense," the court instead applied the special "career offender" guideline. U.S.S.G. 4B1.1 (see appendix for the full text). That guideline applies to an offender who meets its "career offender" definition, which, for present purposes, includes a person convicted of a "controlled substance offense" who also "has at least two prior felony convictions of . . . a controlled substance offense," which latter term -4- 4 means an offense under a federal or __ state law prohibiting the manufacture, _____ import, export, distribution, or dispensing of a controlled substance . . . or the possession of a controlled substance . . . with intent to manufacture, import, export, distribute, or dispense. U.S.S.G. 4B1.2(2) (emphasis added). The special "career offender" guideline contains a table with offense levels geared to the maximum sentence in the statute of conviction. It says that the table "shall apply" to a "career offender" if the table level is "greater than the offense level otherwise applicable." The "career offender" guideline also specifies that a "career offender's criminal history category in every case shall be Category VI." At the sentencing hearing, the parties agreed that the drug statute subjected Beasley to a maximum penalty of forty years imprisonment. And, the offense level table provides an offense level of 34 for a career offender, who, like Beasley, was subject to a maximum penalty of "25 years or more" (but less than life). Because the ordinary drug conviction guideline (applicable to an offender with just over three kilograms of heroin) also specifies an offense level of 34, U.S.S.G. 2D1.1(c)(5), the table in the "career offender" guideline made no difference. The -5- 5 requirement that a "career offender's criminal history category" must be "Category VI," however, did make a difference, for it increased Beasley's guideline sentencing range, from one of 188 to 235 months, to one of 262 to 327 months, thereby authorizing the 22-year sentence that the district court imposed. Beasley, as we have said, appeals both his conviction and his sentence. (We note, parenthetically, that the drug statute, in fact, seems to subject an offender such as Beasley to a maximum term of life imprisonment, not forty years. See 21 U.S.C. 841(b)(1)(B). But, in light ___ of the government's sentencing concession in the district court, we assume no error in the point. And, we shall consider the sentencing aspect of the appeal on that assumption.) II The Career Offender Guideline's Prior Drug Offense ____________________________________________________________ Definition __________ Beasley's most important argument concedes that the district court correctly applied the guidelines as they are written. He claims, however, that the Sentencing Commission lacked the legal power to define a prior conviction for a "controlled substance offense" to include -6- 6 state, as well as federal, convictions. Beasley notes that _____ the Commission itself indicated that it meant its "career offender" guideline to reflect the requirements of a particular statutory provision, namely 28 U.S.C. 994(h). See U.S.S.G. 4B1.1 Background statement (explaining that ___ the "career offender" guideline meets 994(h)'s requirement that the guidelines "specify" for certain "career offenders" a "sentence . . . at or near the maximum term authorized" by statute). He urges us to judge the lawfulness of the guideline on the basis of the legal ground upon which the Commission explicitly (and apparently exclusively) rested it. Cf. SEC v. Chenery Corp., 318 U.S. 80, 87 (1943) __ ___ ______________ (reviewing agency action on the basis of the agency's actual rationale). And, he says, the statute's language is not consistent with the Commission's decision to include state "controlled substance" convictions. That statutory language says that an offender should be treated as a "career offender" if, among other things, he has "previously been convicted of two or more prior felonies, each of which is" (A) a crime of violence; or (B) an offense described in section 401 of the Controlled Substances Act (21 U.S.C. 841), sections 1002(a), 1005, and 1009 of the Controlled Substances Import -7- 7 and Export Act (21 U.S.C. 952(a), 955 and 959), and section 1 of the Act of September 15, 1980 (21 U.S.C. 955a). 28 U.S.C. 994(h)(2). Part (B) of this definition, defining prior drug convictions, unlike part (A), lists specific federal statutes. That fact, in Beasley's view, means that Part (B) of the definition does not include ___ convictions under state statutes. And, he says, that exclusion makes sense, for state drug convictions, compared with federal drug convictions, typically involve smaller amounts of drugs. We, like the other two circuits that have considered this question, do not accept Beasley's argument, for three basic reasons. First, although the language of Part (B), unlike Part (A), does refer to specific federal statutes, if one reads its words literally, it does not exclude, but rather includes, convictions under state law. ________ Part (B) refers to "an offense described in" the particular ____________ specified federal statutes. Those statutes describe behavior commonly called "drug trafficking." They refer to such activities as the making, importing, exporting, distributing, or dispensing, of drugs, and possessing drugs with an intent to engage in these activities. They do not refer to simple possession of drugs (except when entering or -8- 8 leaving the country). A literal reading of the statute would include a conviction under a state law that criminalizes some, or all, of these same activities, for such a state law would create "an offense described in" the ____________ federal statute. Second, examination of the purpose of the statutory provision supports the literal reading just described. Congress wrote that the provision's objective was to ensure that "substantial prison terms [are] imposed on repeat violent offenders and repeat drug traffickers." S. Rep. No. 225, 98th Cong., 2d Sess. 175 (1984), reprinted _________ in 1984 U.S.C.C.A.N. 3182, 3358. Beasley's interpretation __ would frustrate this objective, for, on that interpretation, the statute would not require a "substantial prison term" for a "repeat drug trafficker" apprehended by state authorities and punished under state, rather than federal, law. We have found nothing in the history of the legislation, nor in its language, that explains why Congress would want to insist (as it did) upon a "substantial prison term" for an offender who repeats earlier violent conduct _______________ (irrespective of jurisdiction) but not want to insist upon a similar "substantial prison term" for an offender who similarly repeats earlier drug trafficking conduct. -9- 9 Third, Beasley's interpretation would create a significant anomaly in a guideline system, the primary objective of which is to create uniformity of sentencing treatment. See Mistretta v. United States, 488 U.S. 361, ___ _________ _____________ 365-66 (1989); 28 U.S.C. 991(b)(1)(B) (guidelines should "avoid[] unwarranted sentence disparities among defendants with similar records who have been found guilty of similar criminal conduct"). In seeking uniformity, to distinguish among offenders on the basis of different behavior, or different criminal backgrounds, often makes sense, when considered in light of the basic purposes of punishment (e.g., deterrence, "just deserts," incapacitation, or rehabilitation, see 18 U.S.C. 3553(a)). To distinguish ___ among them on the basis of which jurisdiction happened to __________________ punish the past criminal behavior seems (in the absence of some special circumstance) close to irrational. Compare _______ U.S.S.G. 4A1.1 Background statement (prior convictions for criminal history purposes "may represent convictions in the federal system, fifty state systems, the District of Columbia, territories, and foreign, tribal, and military courts"). Beasley argues, to the contrary, that state drug trafficking convictions often involve smaller amounts of -10- 10 drugs. We do not know the extent to which that is so. But, in any event, Congress does not normally key recidivism __________ punishments to the amount of drugs involved in earlier, predicate convictions. See, e.g., 28 U.S.C. 994(h); 21 _________ ___ ____ U.S.C. 841(b). And, to read this statute as representing an effort to do so seems at least as likely to produce a crazy-quilt of punishment results, as to connect similar punishments rationally to similar past behavior. Beasley's strongest argument is that Congress, in other statutes, has written the term "state law" explicitly when it has wanted to include convictions under state law. See, e.g., 28 U.S.C. 994(i); 21 U.S.C. 841(b); 18 U.S.C. ___ ____ 924(e). In fact, until Congress amended 21 U.S.C. 841(b) specifically to allow sentence enhancements based on prior state law drug convictions, courts had held that the statute did not apply to those state drug convictions. See, ___ e.g., United States v. Gates, 807 F.2d 1075, 1082 (D.C. ____ _____________ _____ Cir. 1986), cert. denied, 481 U.S. 1006 (1987); United _____________ ______ States v. Johnson, 506 F.2d 305, 307 (7th Cir. 1974), cert. ______ _______ _____ denied, 420 U.S. 1005 (1975). However, the language used in ______ the earlier version of 841(b) is different from the "described in" language of 994(h). See 21 U.S.C. ___ 841(b)(1)(A) (referring to "prior convictions . . . for an -11- 11 offense punishable under . . . any . . . other law of the United States relating to narcotic drugs" (before amendment)). Furthermore, the legislative history of former 841(b)(1)(A), unlike the legislative history here, makes clear that Congress intended that enhancement provision to apply only to a prior federal conviction. See Gates, 807 _______ ___ _____ F.2d at 1082. Congress can embody a similar scope-of- coverage intent in different ways in different statutes. The upshot is that the statute's purpose, and the purpose of the sentencing laws of which that statute is a part, both support the Commission's interpretation of the statute. The language of the statute, when read literally, favors that same conclusion. We find the arguments to the contrary plausible, but ultimately not convincing. We therefore conclude that the statutory provision authorizes the Commission to define "career offender" as it has done, that is, to include those with prior state law convictions for offenses of the sort defined in the listed federal statutes. III Other Arguments _______________ 1. The Amount of Heroin. Beasley was sentenced _____________________ under the belief that the applicable offense statutory -12- 12 maximum was 40 years, and thus, under the career offender guideline, offense level 34 applied. Beasley argues that the court applied the wrong statutory maximum because the provision it used, 841(b)(1)(B), applies only if the violation involved 100 grams or more of heroin. And, he says that the evidence did not support the district court's finding that he knew about the 3 kilograms of heroin. Rather, he says that the evidence shows that he only knew about 5 grams of heroin. However, even if it were relevant ________ for sentencing purposes that Beasley believed the suitcase contained only five grams of heroin, the same offense level would apply. See 21 U.S.C. 841(b)(1)(C) (30 years maximum ___ sentence if repeat offender and violation involved less than 100 grams of heroin); U.S.S.G. 4B1.1(b) (specifying level 34 if statutory maximum for offense exceeds 25 years). Regardless, the evidence was more than sufficient to support the district court's factual conclusion that Beasley knew the suitcase contained about three kilograms of heroin. The complex nature of the crime, the elaborate delivery precautions, the suitcase that in fact contained more than three kilograms of heroin, the fact that Makdessi told him the suitcase contained a lot of heroin, the fact that heroin had leaked out and was contained in a shower -13- 13 cap, and his having lifted and shaken the suitcase, together provide more than enough support for a finding that he actually knew the transaction involved more than one kilogram. The only contrary evidence lies in the fact that he paid only $20,000, far less than the wholesale value of one kilogram. Yet, nothing in the record suggests that the $20,000 sum was meant to be more than a partial payment. Thus, this fact does not lead us to a contrary conclusion. Because the record supports a finding of actual knowledge (and because any error was harmless), we need not consider other mental states and other circumstances. Cf. United ___ ______ States v. Ekwunoh, 813 F. Supp. 168, 179 (E.D.N.Y. 1993) ______ _______ (holding that, in some circumstances, defendant cannot be sentenced for possessing more drugs than he reasonably believed he possessed). 2. Ineffective Assistance of Counsel. Beasley ___________________________________ says that his counsel was "ineffective" in failing to attack the "chain of custody" receipts for the heroin, which attack, in his view, represented his only hope of acquittal. The record before us provides no basis for accepting his "ineffective assistance" claim. The government introduced what seems to be strong evidence of custody. The trial court, as a general matter, praised counsel's performance. -14- 14 We do not normally consider claims of "ineffective assistance" on direct appeal, for such claims may require a court to go outside the trial record, for example, to consider counsel's trial strategy. United States v. Mala, _____________ ____ No. 91-2229, slip op. at 9-10 (1st Cir. Oct. 27, 1993). We see no reason for making an exception to that rule in this case. 3. Waiver of Counsel. In mid-trial Beasley asked _________________ the trial court to permit him to discharge his counsel and proceed on his own. The trial judge warned Beasley about the dangers of doing so. But, when Beasley persisted, he granted Beasley's request, having asked counsel to remain to advise Beasley if necessary. Beasley now argues that the "totality of the circumstances" establish that Beasley did not "knowingly and intelligently" waive his Sixth Amendment right to counsel. See Farretta v. California, 422 U.S. 806, ___ ________ __________ 835 (1975); United States v. Hafen, 726 F.2d 21, 24-26 (1st _____________ _____ Cir.), cert. denied, 466 U.S. 962 (1984); Maynard v. _____________ _______ Meachum, 545 F.2d 273, 277-79 (1st Cir. 1976). He says that _______ the record does not make it sufficiently clear that he "was aware of the dangers and disadvantages of self representation, the technical requirements of trial, and the -15- 15 potential penalties he was facing." Appellant's Opening Brief at 29; see Maynard, 545 F.2d at 279. ___ _______ Having reviewed the record, we do not agree with Beasley's conclusions. The district court clearly explained the disadvantages of his choice and the technical nature of the trial. The judge discussed in detail the calling of witnesses, the presentation of closing arguments, and the need to review jury instructions, all to help Beasley understand the magnitude of what he proposed to do. Moreover, Beasley's past record -- his two prior drug convictions -- suggest some familiarity with the serious nature of trials and their potential technicality. Similarly, the fact that Beasley had previously received a five-year sentence for violating the same statute, along with the notice of enhanced sentence that the government sent to Beasley and the detention hearing where the government told Beasley he faced a possible life sentence, all indicate that Beasley was aware of the potential penalties he was facing. Beasley now says that he erroneously thought he would not be permitted to testify unless he dismissed his lawyer, but the record provides no basis for the district court's having believed Beasley -16- 16 entertained that thought nor any objective basis for his having done so. Despite the court's explanation of disadvantages of self-representation and the technicalities of the trial, Beasley insisted, quite clearly, that he wanted to represent himself. The trial court, therefore, properly permitted him to do so and wisely asked his counsel to stay and offer advice if necessary. We find no error. 4. Reasonable Doubt. Beasley argues that the law ________________ required the district court to define the term "reasonable doubt" in its jury instructions. The court, however, gave the type of instruction that this court approved in United ______ States v. Olmstead, 832 F.2d 642 (1st Cir. 1987), cert. ______ ________ _____ denied, 486 U.S. 1009 (1988). We have held that the law ______ does not require a further, more detailed explanation. United States v. Campbell, 874 F.2d 838, 843 (1st Cir. _____________ ________ 1989); Olmstead, 832 F.2d at 646. ________ For these reasons, the judgment of the district court is Affirmed. _________ -17- 17 Note: See slip opinion for copy of Appendix. -18- 18